Case 2019CV005816   Document 11   Filed 08-02-2019   Page 1 of 17

FILED
08-02-2019
John Barrett
Clerk of Circuit Court
2019CV005816

**STATE OF WISCONSIN  CIRCUIT COURT  MILWAUKEE COUNTY**

Kevin J. Renken,

              Plaintiff,

v.

              Case No.: 19CV5816
              Case Code: 30105
              Intentional tort

**Board of Regents of the
University of Wisconsin System,
University of Wisconsin- Milwaukee,
Mark Mone, and
John Boyland,**

              Defendants.

---

## AFFIDAVIT OF KEVIN J. RENKEN
## SUPPORTING MOTION FOR TEMPORARY RESTRAINING ORDER

---

STATE OF WISCONSIN   )
                            ) SS
COUNTY OF MILWAUKEE )

The undersigned Kevin J Renken, being first sworn on oath, deposes and says:

1. I am a tenured Associate Professor of Mechanical Engineering at the University of Wisconsin-Milwaukee ("UWM"), have been employed there as a professor since 1987, and am the plaintiff in this action. I make this affidavit in support of my motion for a temporary restraining order.

2. On February 28, 2019, I learned that eight members of the UWM Department of Mechanical Engineering had filed a complaint against me with the UWM University Committee alleging that I had "engaged in disruptive, abusive, and bullying behavior" against members of the faculty and asking that discipline be imposed against me in accordance with the UWM Policies and Procedures.

3. The University Committee referred the complaint to the UWM Faculty Rights and

Responsibilities Committee (the "FRRC") for consideration.

4. On March 3, I alerted the chair of that committee, John Boyland, that I had previously filed a complaint against those same claimants with the University's Office of Equity/Diversity Services for discrimination, bullying, and harassment in April, 2018, which was still pending, and pointed out that the University had a formal policy prohibiting retaliation against individuals who engage in protected activities including filing complaints. I asked Professor Boyland if I would be permitted to share this complaint with that office. He replied that he could not advise that and warned that doing so might be considered retaliatory by me.

5. On April 2 I received from Professor Boyland 23 pages of additional materials that had later been filed by the complainants to support their complaint against me (bringing it to 90 pages in all), and on April 16, I filed a written response.

6. On April 30 I received the FRRC's written "tentative conclusions" from Professor Boyland. They did not make reference to any investigation by the FRRC other than reading the complaint and my responses. I was not interviewed in the interim nor am I aware of any investigation that may have been conducted by the committee.

7. In his transmission memorandum on April 30 Professor Boyland said that I could file a written response to the tentative conclusions and that if I did not agree with them, I should indicate which parts of the conclusions I disagreed with. He also said that "if there is no agreement between the parties to the FRRC conclusions, the FRRC may invoke formal fact-finding procedures in conformity with P&P 5.45 (3)."

8. The recommendations in the FRRC's tentative conclusions were that I be excluded from attending faculty meetings for one academic year, that I participate in counseling, and that a

letter of reprimand be placed in my personal file.

9. On May 14 I filed a written response per Professor Boyland's instructions stating that I disagreed with the tentative conclusions and indicating which of them I disagreed with by highlighting them in yellow.

10. In a follow-up email on May 15, Professor Boyland suggested I might want to amplify my objections with explanations, but when I pointed out that no such requirement had been indicated he replied by email that he agreed with me.

11. At 11:58 a.m. that same day, May 15, Professor Boyland sent me an email attaching the complainants' response to the tentative conclusions and advising that he would send the final determination of the FRRC within 10 days.

12. I did not know that the FRRC had a closed meeting already scheduled to start at 11 o'clock that very morning to consider the complaint and issue its final report, and was probably already in session and may have already reached a decision when Professor Boyland sent his email at 11:58 a.m.

13. The complainants' response, which was dated May 6, but which I had not seen until it came to me attached to Professor Boyland's May 15, 11:58, email, contained false allegations and representations that had not been included in the complaint and urged more severe discipline, including suspension from meetings and committee memberships for two academic years, a professional behavioral evaluation, adjustments to my academic schedule, and that "more serious disciplinary action than another reprimand letter should be considered."

14. This new complaint included the accusation that I had failed to comply with a past disciplinary order by "refusing to perform [my] service duties." That is false and defamatory, and

-3-

could easily have been disproven.

15. Other new allegations in this amended complaint were that I had "made gun threats against fellow faculty members" and had "engaged in xenophobic rhetoric." These accusations were false, incendiary, and could have been refuted by pointing to evidence contradicting them already filed with the FRRC.

16. I immediately emailed to Professor Boyland that the May 6 submission by the complainants, which I had just seen for the first time, contained new allegations. He did not respond. The FRRC closed meeting was either still in session or had already ended.

17. Based upon the scheduled time for the FRRC closed meeting and the time entries on the emails, when Professor Boyland sent me the complainants' May 6 submission and I sent my objection to the introduction of the new materials, the FRRC had already considered them and had made its findings and had already voted and decided on the discipline it would recommend.

18. On May 17, with no response from Dr. Boyland to my objection to the new allegations, I sent him an email stating "As per UWM P&P 5.45(3), I am invoking my rights to a fair hearing on this complaint."

19. Dr. Boyland responded that the FRRC had "already completed its investigation and issued its findings to the Chancellor. Section 5.45 is longer operative at this time." It was too late to get a hearing.

20. He further stated that the committee had decided not to invoke the formal fact-finding procedures he had said it might do if the parties disagreed and that my only recourse now would be to file objections with the chancellor.

21. At this point I had no idea what the findings and recommendations were.

-4-

22. I received the Final Report from Professor Boyland later that day with a memorandum transmitting it to the Chancellor.

23. The Final Report gives no indication that the committee conducted any investigation other than merely reading the submissions of the parties. I was not interviewed nor am I aware that anyone else was or that any investigation not reflected in the Final Report took place.

24. The findings and recommendations in the Final Report referred to and relied heavily on the complainants' May 6 supplementation of the record, which I had not seen and to which I had not been able to respond, including reference to a prior complaint resulting in disciplinary orders with which I had fully complied. It recommended because of those additional assertions that I be suspended without pay for two academic years starting with the fall of 2019 and that a repetition of the alleged behavior would warrant my being dismissed for cause.

25. My attorney filed objections to the Final Report with the chancellor on my behalf, asking that the complaint be dismissed or that my request for a fair hearing should be granted.

26. The chancellor issued a decision on July 8 (copy attached) upholding the committee's final findings, suspending me without pay for the fall and spring semesters of 2019-20, canceling a pending sabbatical, barring me from being present at the University campus, and denying my request for a hearing.

27. In his written decision, the chancellor recited that despite the requirement that his review must be based upon the record before the FRRC, he had independently interviewed a witness in order to justify his decision.

28. Suspension without pay for two semesters will cause me the loss of approximately $90,000.00 in salary plus loss of benefits.

29. Being barred from the campus and from contact with the university will interrupt or force the termination of pending research and academic projects, will require me to abandon or breach the terms of grants or pending grant applications, and will make it impossible for me to conduct research, to apply for grants, or to fulfill my obligations to participate with and supervise my graduate students and other students in the completion of their essential academic coursework and requirements for conferring of degrees.

30. Besides the economic loss and the disruption of the progress of my professional career, this public discipline will irreparably damage my professional and personal reputation, which prior to this time has included numerous awards and professional recommendations, and will inflict hardship and humiliation on my family.

31. In addition to the impact it will have on my financial situation and my reputation, it will also have a negative impact upon students with whom I have been working and supervising and who are dependent upon me because of the relationships we have built up and for continuity in their pursuit of their careers.

32. On the other hand, restraining the defendants from implementing this discipline pending completion of a fair hearing will not cause any financial loss to the university or the other defendants nor will it have any effect upon their public or private reputations.



Kevin J. Renken
*Digitally signed by Kevin J. Renken*
*DN: cn=Kevin J. Renken, o, ou,*
*email=renken@uwm.edu, c=US*
*Date: 2019.07.30 10:23:14 -05'00'*

_____
Kevin J. Renken

Subscribed and sworn to before me ~~this~~ *telephonically* 30th day of July, 2019

_____
Notary Public, State of Wisconsin   My Commission ~~expires:~~ is permanent

-6-



**UNIVERSITY of WISCONSIN**
**UWMILWAUKEE**

*Office of the Chancellor*

Chapman Hall
P.O. Box 413
Milwaukee, WI
53201-0413
414 229-4331 phone
414 229-2347 fax

VIA EMAIL AND US FIRST CLASS MAIL

July 8, 2019

Prof. Kevin Renken
2020 N. Lincoln Park W Apt 29E
Chicago, IL 60614-4731
renken@uwm.edu

      Re:    FRRC complaint

Dear Professor Renken:

This letter serves as my decision on the Faculty Rights and Responsibilities Committee ("FRRC") complaint against you that was brought by Professor Deyang Qu on behalf of himself and seven of your Department of Mechanical Engineering ("ME") colleagues on February 21, 2019. That complaint was based on several allegations that you engaged in "disruptive, abusive and bullying behavior," among other actions that the FRRC believed should be addressed through other campus processes.

The FRRC issued its proposed decision on April 30, 2019. Both Professor Qu and you objected to the FRRC's proposed decision, and on May 17, 2019, the FRRC issued its final findings and recommendations. The FRRC recommended that you be suspended, without pay, for academic years 2019-21. Professor Qu did not object to the FRRC's final findings and recommendations, but your attorney submitted objections on your behalf as permitted by UWM Faculty Policies and Procedures § 5.46(1).

Based on the above and my review of the record, I concur with the FRRC's findings and recommendations, in part, and hereby impose the following sanctions:

1. Cancellation of your sabbatical for Fall 2019;
2. Unpaid suspension for the Fall 2019 and Spring 2020 semester contract periods;
3. Ban on serving on any university committees, including the ME executive committee, and from participating in any faculty meetings, including departmental and college meetings until you have successfully completed an assessment with an outside provider and any recommended training by that provider. UWM will pay the costs of the assessment and any recommended training. This training must be completed by the end of the Fall 2020 semester.

Because you will be on an unpaid suspension, you will not be asked to engage in training until you return to pay status.

The full rationale for my decision as well as my response to your objections follows.

**Procedural Objections**

1. **"Failure of Notice and Denial of Fair Hearing"**[1]

Citing a prohibition in relying exclusively on hearsay to reach a decision in administrative proceedings, you object to the FRRC's conclusions as impermissibly based exclusively on hearsay. There is no *per se* prohibition in relying on hearsay in administrative proceedings. Rather, Wisconsin case law, including the case cited by your attorney, instructs administrative tribunals not to rely exclusively on *uncorroborated* hearsay in reaching decisions. Stated differently, the FRRC could not rely solely on those statements if they were disputed.

You do not deny that you referred to your colleagues as "foreign assholes." For three of the instances (lettered 2(4)(a), (b), and (c)[2] in the FRRC's report), you also did not deny the allegations. In addition, there are contemporaneous emails to support allegations 4(a) and (b). Thus, the FRRC is not relying upon uncorroborated hearsay, meaning solely the statements by your colleagues in the complaint in these instances.

Of the statements relied upon by the FRRC, you have disputed only one of them, and that is the gun comment. I agree that for purposes of considering whether disciplinary action is appropriate, the FRRC relied upon uncorroborated hearsay in considering the alleged statement that you made to Prof. Emeritus Balmer, who then reported it to Prof. Qu and which the UWMPD investigated. While the UWMPD interviewed Prof. Balmer and concluded that you had made the comment based on its interviews with Prof. Balmer, the FRRC did not interview Prof. Balmer and instead relied upon the UWMPD report. Since you raised the issue, however, I contacted Prof. Balmer. He confirmed for me directly that you made statements that you were thinking about where to get a gun. He was clear that you made these comments in the context of your post-tenure review, although he considered it a joke and not a true threat. Further, he confirmed that he provided this same information to the UWMPD.

Given Prof. Balmer's firsthand account to me of your statements, the issue is then one of credibility between his testimony to me and your denial that you made such statements. On balance, I find Prof. Balmer's version to be more credible. First, he has no reason to invent such statements. Second, he thought it sufficiently remarkable, although not necessarily as a credible threat, to report it to Prof. Qu. Third, he confirmed to a UWMPD police officer and the UWM Police Chief in separate interviews that you made the statements. Finally, he confirmed again for

---

[1] For purposes of responding to your procedural objections, I am referring to them in the manner in which they were labeled by your attorney in his June 3, 2019 letter to me.

[2] 4(a) refers to "In departmental executive meeting 2016/12/20, used the work "fucking" several times, even after warnings; 4(b) refers to "In departmental meeting 2017/2/9, referred to proposals by Prof. Qu as "stupid," and when a professor voted against Prof. Renken's wishes, pointed a finger at him and asked "are you really, really?"; 4(c) refers to in departmental meeting 2018/2/1, continually interrupted chair and yelled "shut up."

2

me on July 3, 2019 that you made the statements. In contrast, you have a strong motivation to deny the statements both in the context of a police investigation and in this process.

You also further object to the FRRC having relied on Professor Qu's response to the proposed findings and recommendations because it referred to your prior discipline in 2013 and allegedly false rhetoric that "[Prof. Renken] has made gun threats against fellow faculty members and engaged in xenophobic rhetoric." The FRRC does not appear to have relied on this statement and did not make any finding that you made multiple gun threats or engaged in xenophobic rhetoric generally. To the contrary, the FRRC has parsed a large number of allegations against you and declined to address those that were better managed in another forum, rejected those that were not supported by evidence, and, with one exception that I will discuss below, relied only on those allegations that had evidentiary support.

Finally, you object that your request for the FRRC to institute its formal factfinding procedures via a fair hearing was rejected. I concur with the FRRC's determination on this issue, and Prof. Boyland's explanation of it comports with UWM Faculty Policies and Procedures and the FRRC's Procedures. Specifically, FRRC Procedures § 6.4 provides, in relevant part: "In accordance with UWM P&P 5.45(3), the subject(s) of the complaint have a right to a fair hearing and may invoke this right in writing to the Chairperson at any time *during the course of the Committee's investigation*" (emphasis added). As Prof. Boyland explained, and as the record reflects, the FRRC decided at its meeting on May 15, 2019 to conclude its investigation and issue findings and recommendations per FRRC Procedures § 7.3. When you made your request for a fair hearing on May 17, the committee had ended its investigation, and it was too late to invoke the right to a hearing.

### 2. "Concerns of Due Process and Fairness" and "Double Jeopardy"

You have characterized the FRRC's findings and disciplinary recommendation as follows:

> The surprise imposition of a two-year suspension without pay based on a surprise argument about which Professor Renken had no notice and no meaningful opportunity to rebut, has turned this into something far greater than an intramural effort to correct allegedly inappropriate spoken behavior by a professor. Restricting Dr. Renken's arguments solely to the record developed by the Committee denies him due process. Dr. Renken had a right to request a fair hearing at any time during the investigation. He also had a right to receive a copy of the complaint with full notice of the charges against him within the time available to him to request the hearing.

(Letter from Ehlinger to Mone, June 3, 2019, p.12).

As discussed above, while you have the right to request a fair hearing, your request was made only after the FRRC had concluded its investigation and, thus, too late in this process. Moreover, you were given an opportunity to refute each of the factual allegations against you and the FRRC's tentative conclusions. When given the latter opportunity, however, you declined to provide any specific objections or rationale for any disagreement with the FRRC's tentative findings, process, or any other aspect of its investigation. Instead, you highlighted in yellow

portions of the FRRC's report. When specifically asked for the reasons for your disagreement with the highlighted sections, you responded as follows to FRRC Chair John Boyland:

> You did not request commentary from me in your April 30, 2019 memorandum. You stated, 'If you do not agree with the conclusions, please indicate which part or parts of the conclusions you disagree with in your written reply.' My e-mail clearly states that I disagree with the conclusions and highlights my disagreements.
>
> Dr. Qu's May 6, 2019 reply has introduced new allegations.
>
> * * *
>
> You did not ask for comments ... I would have supplied them.
>
> * * *
>
> I was following instructions in your memorandum ... if you wanted commentary then you should have asked for it.

(Emails from Renken to Boyland, May 15, 2019)

Apart from the summary allegation that "Dr. Qu's May 6, 2019 reply has introduced new allegations," you did not provide any specific basis for your objection, raise procedural concerns, or otherwise comment on the proposed findings and recommendations. With respect to Prof. Qu's May 6, 2019 response, the FRRC did not introduce any new allegations between the proposed and final findings, so any such allegations by Prof. Qu are immaterial. As I will discuss below, the fact of raising your past disciplinary record is not a new allegation of misconduct. Further, to the extent this objection is based on any characterization of your conduct by Prof. Qu, such characterizations are not new allegations of wrongdoing and were not considered by the FRRC.

Finally, you raise the issue of the use of your past discipline in this investigation and frame it in terms of "double jeopardy." On this issue, UWM Faculty Policies and Procedures § 5.45(6) provides:

> Further Jeopardy Prohibited
>
> Following the recommendations of the committee, the faculty member involved shall not be charged again for the same misconduct.

In this case, while Prof. Qu provided and the FRRC considered your prior disciplinary record, there was no charge or proposed additional sanction for your prior misconduct. Rather, the FRRC considered the fact that you had been disciplined previously for similar misconduct when determining the appropriate sanction. Specifically, it said:

4

> We find that Prof. Renken's behavior contravenes these standards and expectations, and furthermore that the behavior is not a single one-off error in judgment, but rather a pattern of behavior that has been ongoing for years[3] ... In their response to our tentative conclusions, the complainants copied Chancellor Lovell's prior disciplinary letter to Prof. Renken (dated 2013/3/12). The letter included language that if Prof. Renken were to engage in similar violations, he would be 'subject to more serious discipline and/or dismissal.' Given the fact that recommendations substantially equivalent to our tentative conclusions were put into effect from 2013 through 2014 and that Prof. Renken's unacceptable behavior has nonetheless continued, we do not think our original sanctions are sufficiently severe. Thus, we have considerably stiffened our sanctions in the recommendations listed below.

(UWM FRRC Report, May 17, 2019). The FRRC explained explicitly that it was not seeking to sanction you again for your prior conduct. Instead, it was considering whether its proposed sanctions were adequate given that you had already been disciplined for prior, similar conduct, and it is entirely justified for discipline to progress in severity as misconduct recurs. Thus, there is no violation against the prohibition on "further jeopardy" as defined in the UWM Faculty Policies and Procedures. Further, as you were aware of your past discipline and contemporaneous warnings against future misconduct, it was not unfair nor a surprise to rely upon your past discipline in recommending a sanction for your more recent misconduct.

### 3. Conditional Privilege

You contend that your statements to the UWMPD are "conditionally privileged" since they occurred in the context of a police interview.[4] Specifically, you stated to a UWMPD officer that your colleagues are "foreign assholes" and repeated this characterization to Chief LeMire (UWMPD Incident Report 180667). Citing Wisconsin case law, you contend that "[s]tatements made to law enforcement are conditionally privileged and only under extreme circumstances may the person who made them be punished either criminally or civilly."

The issue in the cited case, however, was whether a person can be sued for libel or slander because of statements made to a district attorney. *See also Niedert v. Rieger*, 200 F.3d 522 (7th Cir. 1999) ("under Wisconsin law, '[w]itnesses are immune from **civil liability for damages** caused by false and malicious testimony'") (emphasis added). Considering whether statements made within UWM about other UWM staff violate the Code of Conduct does not constitute civil liability and certainly is not a private, civil cause of action for damages. Accordingly, there is no

---

[3] You object to being "accused of a pattern of behavior that had been ongoing for years and no opportunity to rebut that accusation." (Letter from Ehlinger to Mone, p. 5). I do not read the FRRC's reference to "ongoing for years" to suggest that the FRRC has concluded that you have been engaged in misconduct continuously since 2013 and/or based on allegations of which you are unaware. Rather, you engaged in misconduct in 2010, which consisted of several incidents involving multiple people for which you were disciplined in 2013 and reengaged in specific instances of misconduct in 2016, 2017, and 2018 as alleged in the current complaint. That can be fairly characterized as a pattern when the behavior is similar, repeated, and occurred across multiple years.

[4] While you included the alleged gun statement in this context, it would not be subject to any privilege, even if one applies, as you did not make or confirm this statement in a police interview.

5

conditional privilege that protects your statements within UWM, even to a police officer, from consideration under UWM's Code of Conduct.

### Allegations and Sanction

The FRRC found that you violated UWM's Code of Conduct in seven instances as follows:

1. You mentioned multiple times to Prof. Balmer that you were thinking "where [you] could get a gun" in order to handle your difficult departmental situation.
2. You referred to your colleagues as a "bunch of foreign assholes."
3. In a departmental executive committee meeting on December 20, 2016, you used the word "fucking" several times, even after warnings.
4. In a departmental meeting on February 9, 2017, you referred to Prof. Qu's proposals as "stupid" and when a professor voted against your wishes, you pointed a finger at him and asked "are you really, really?"
5. In a departmental meeting on February 1, 2018, you continually interrupted the chair and yelled, "shut up."
6. In a departmental meeting on February 14, 2019, you characterized experimental sessions for a course designed by a colleague as a "can of shit."

You did not substantively dispute allegations 2 through 5, and I explained above my credibility determination and conclusion concerning the gun comments. You denied allegation number 6, and the FRRC "accepted the validity of this claim" based on your alleged repetition of the phrase against your colleague during this process. You did not, however, acknowledge using the phrase as alleged and using the phrase during these proceedings is not sufficient evidence to conclude that you used this phrase as alleged in the past. Thus, I am not considering allegation number 6 as a violation of any policy.

On the other hand, the FRRC dismissed your colleagues' complaint concerning your recording of departmental and executive committee meetings as permissible by law. You do not deny the allegations that you "bring[] a recording device to ME and MEEC meetings (now guarded by an armed police officer) and place[] it on the table demonstratively, in the recording mode. Apparently this is an attempt to intimidate his colleagues and prevent them from speaking up."

I agree with this characterization of the way you record meetings and conclude this is another violation. While you are permitted by law to record the meetings, how you do that appears to be an attempt to intimidate your colleagues, especially when viewed together with your other hostile conduct in meetings. If your sole intent were to preserve the meetings' content, you would simply ask your colleagues whether they objected to your recording, and, if they did, you could explain that you believe you are legally entitled to record the meetings. Placing the device on the table in an obvious manner with it already recording is consistent with your colleagues' allegation that you are using an otherwise permitted behavior to bully or intimidate them.

These incidents violate the Code of Conduct's expectation of equity and respect and UWM Respectful Campus Standards. They also violate specific Behavioral Standards and Expectations as follows:

6

1. Employees are expected to carry out their instructions, duties and responsibilities as set forth in the descriptions of their positions with care and competency and as directed by those with authority to assign the work.

6. Employees are expected to conduct themselves with a degree of reasonable and proper care so as not to damage or injure others.

13. Employees must respect the rights of others to be free of bullying, harassment, intentional physical harm or intimidation in the workplace.

14. Employees must respect the rights of others to be free from intentional or personally-directed abusive or offensive language in the workplace.

19. Employees are expected to display courteousness and use good judgment in dealing with the public and others in the University community.

Together, these incidents meet the UWM Respectful Campus Standard's definition of bullying:

> unwanted offensive and malicious behavior which undermines an individual or group through persistently negative verbal or psychological abuse. There is typically an element of vindictiveness and the behavior is calculated to threaten, undermine, patronize, humiliate, intimidate, or demean the recipient.

The context in which we operate is critical to considering the effect of your behavior upon your colleagues and upon UWM generally. As you know, UWM, as a university, is somewhat unique in its organization. Under Wisconsin law, faculty have a right of shared governance, which includes the "primary responsibility for advising the chancellor regarding academic and educational activities and faculty personnel matters." Wis. Stat. § 36.09(4). Within our organization, the academic departments and their executive committees play a critical role. Per UWM Faculty Policies and Procedures § 4.03:

> The immediate government of the department is vested in its departmental faculty (as defined in 4.02), which has jurisdiction over all the interests of the department, with authority to determine all departmental questions of educational and administrative policy, other than those matters which are vested in the Departmental Executive Committee by 4.05. The faculty of the department shall be responsible for teaching, research, and public service and shall carry out academic planning processes on a regular basis, including, but not limited to the preparation of the academic program plans for the department. Each department shall meet at least once each semester, and minutes reflecting all formal actions taken shall be recorded.

The departmental executive committee, as you know, has extensive responsibility under UWM Faculty Policies and Procedures § 4.05(1) for departmental personnel matters:

> The Departmental Executive Committee makes recommendations concerning appointments, dismissals, promotions, salaries, merit allocations, and other personnel and budget matters, which are transmitted through the chairperson to the dean.
>
> Decisions relating to renewal of appointments, recommending of tenure, and merit salary recommendations shall require an evaluation of the following functions: teaching, research, creative activity and/or accomplishments, professional and public service, and contribution to the University. The Departmental Executive Committee shall establish criteria, which shall conform to the affirmative action policies and procedures of the university, for renewal and tenure, as well as for merit increases, by determining the relative importance of the above functions in the evaluation processes. Consideration shall be given to all work and accomplishment that express a faculty member's academic interest. Criteria for renewal and tenure recommendations and for merit salary recommendations shall be written and distributed to all members of the Department and to the appropriate dean. Certification of the distribution of these criteria shall be submitted annually to the Office of the Secretary of the University.

This is an extraordinary amount of responsibility that is vested in a group of employees, and they must be able to work together for our organizational structure to function effectively. In an academic environment, the need for collaboration and cooperation also goes far beyond departmental personnel issues. There are considerations for academic and teaching relationships, research partnerships, space and equipment issues, student issues, and numerous other activities.

In this context, bullying has a particularly corrosive effect. As is demonstrated in the snapshot we have of your behavior as outlined in this complaint, at least one faculty member declined to attend a meeting because he feared being "verbally insulted or screamed at by [you]." (Memo from Qu to University Committee, February 21, 2019, Exhibit 7). If faculty react to bullying behavior by other faculty by removing themselves from meetings, committees, and other group activities, our governance system would quickly break down, and we would have difficulty making required decisions. Further, administrators would be deprived of the benefit of faculty input into critical decisions and policies. It is also of extraordinary concern that eight of the eleven active members[5] of your executive committee submitted this complaint against you, and they summarized these issues as follows:

> It is very difficult for the targeted faculty members to work effectively and efficiently in such a toxic working environment, since most of them are afraid for their life. To avoid any arguments, the chair can only ask Dr. Renken to file a complaint. All this disrupts the normal functioning of the ME department.

---

[5] The ME executive committee has 13 total members, but Prof. Ron Perez, whose tenure home is ME, is serving as the dean of the Zilber School of Public Health and is not an active member of the executive committee. Similarly, Prof. Junhong Chen is on leave from his UWM appointment and not currently active on the executive committee.

8

With respect to the gun comments, I defer to the police investigation and the person to whom you made the comment on the conclusion that the comment did not present an actual threat to UWM. This is also borne out by the lack of any actual safety incident caused by you since then. That said, it represented extremely poor judgment to make such comments on a university campus, in particular, in 2018. Mass shootings have, unfortunately, become commonplace such that any employer has a reasonable fear of such an incident. Since the Virginia Tech shooting in 2007, there have been nationally-reported shootings at over 40 colleges and universities. Thus, concern about this issue by your colleagues is substantially justified. In this context, it is the height of carelessness to make even a joke about acquiring a gun, especially in the context of discussing a personnel dispute. Your colleagues have attested to their real and significant fear that you were not joking, and that fear is not lessened by your actual intent in making the statement. That you made the statement to a colleague you consider a friend does not mitigate your negligence. It is entirely foreseeable in this national environment that such a comment would be reported and that others would learn about it, as happened here.

Similarly, that you referred to your colleagues as "foreign assholes" to a police officer and UWM's Police Chief in the context of a police investigation does not mitigate its harm. Police officers are obligated to memorialize their interviews, so it was foreseeable that your comments would be recorded. Further, as you well know from your own records requests, a substantial amount of UWM records are released to the public. Thus, while you did not direct your comment to your colleagues, you should have known that they would learn about the comment when it was made in an investigation that was prompted by your gun comments. Further, the comment was a gratuitous insult to your colleagues that you made to two other UWM employees on two different occasions. Its effects were harmful and injurious to your colleagues.

The caustic nature of your interactions with others was also on display in these proceedings. In asking for your response to the FRRC's tentative conclusions, Prof. Boyland made multiple attempts to elicit the specific rationale for your disagreement with the conclusions. Instead of taking advantage of his outreach, and conciliatory tone, you instead chose to chastise him for the FRRC's directions by saying, "I was following instructions in your memorandum … if you wanted commentary then you should have asked for it." It is inconceivable to me why you would not provide the requested information to attempt to influence the outcome of your own disciplinary investigation. Instead, you berated the FRRC chair through a series of emails to make the point that you did not find the FRRC's instructions to be clear.

Going forward, I would urge to you consider not only the effect of your communications but your purpose behind them. Critically, you must moderate *the way in which you communicate with others*, regardless of the substantive issues. It is my sincere hope that you will use the time away from UWM to reconsider your communication style and that you will use the required training on this issue to its fullest extent to make real and meaningful changes in how you behave.

I agree with the FRRC that, in light of your 2013 discipline for "angry, belligerent, aggressive, or bullying behavior in a series of telephone conversations with several different staff members throughout the day" (Memo from Lovell to Renken, March 12, 2013), imposing the same level of discipline is insufficient. In the associated letter of reprimand, you were also specifically

9

warned that: "Abusive, angry, and forcefully intimidating behavior is inappropriate and a serious violation of the expected standard of conduct. Continued behavior of this kind will not be tolerated. If further misconduct occurs and/or if you fail to take the remedial actions outlined in the Chancellor's decision, further discipline may be pursued, up to and including dismissal for cause." Your recent conduct is, thus, inexcusable given this history.

At the same time, I am concerned that a two-year suspension is too severe as a next step. Discipline should progress according to its severity and recurrence. While it has been several years since you were disciplined, your conduct is creating serious and detrimental effects upon your colleagues and the functioning of your department. You engaged in several instances of hostile, confrontational behavior with your colleagues, and you exhibited an additional level of anger, poor judgment, and maliciousness in your gun and "foreign assholes" comments such that a slight escalation in the level of discipline is insufficient to address this more recent pattern of conduct. Given that your prior discipline was also based on a pattern of conduct against four different UWM colleagues, a reprimand, separation from meetings, and training appear to have been insufficient to convey to you the seriousness of the situation and your need to change your behavior. There is also a need to protect your colleagues from such abusive conduct until you can reflect on your behavior and conform it to acceptable standards.

Accordingly, I have determined that a two-semester suspension coupled with other remedial and protective measures should serve to address your past conduct and correct it going forward. That said, if you engage in further similar conduct or other misconduct, you will be subject to further discipline up to and including dismissal, which will be explicitly considered. There is no reason that you cannot comply with UWM's Code of Conduct and conduct yourself in a professional, if not collegial, manner.

Finally, you have raised alleged misconduct by your colleagues as an apparent attempt to minimize your own behavior. Wrongdoing by others does not excuse your own bad behavior. Rather, by copy of this letter, I am asking Provost Britz to work with Dean Peters to appoint an investigator for the allegations contained on pp. 13-14 of your attorney's letter to me as possible Code of Conduct violations. If your colleagues engaged in any violations, I would expect a referral to the FRRC for appropriate discipline.

Also by copy of this letter, I am asking CEAS Dean Brett Peters to effectuate the cancellation of your sabbatical, unpaid suspension for the Fall 2019 and Spring 2020 semester contract periods, and facilitation of training with UWM's Employee Assistance Provider or another suitable organization when you return from your suspension. While you are suspended, you are not to be present on campus or have contact with UWM except through Dean Peters or CEAS Asst. Dean Paul Klajbor, and you must immediately return all UWM property in your possession to CEAS Assistant Dean Klajbor. You may contact a UWM Human Resources benefits specialist to determine the effect of your suspension upon your employment benefits.

10

Per Wis. Admin. Code UWS § 6.01(5) and UWM Faculty Policies and Procedures § 5.47, this decision is final except that the Board of Regents, at its option, may grant a review on the record.

Sincerely,

*Mark A. Mone*

Mark A. Mone
Chancellor

cc: Prof. Deyang Qu, Mechanical Engineering Department Chair
Dean Brett Peters, College of Engineering and Applied Science
Asst. Dean Paul Klajbor, College of Engineering and Applied Science
Prof. John Boyland, FRRC Chair
Prof. Kris O'Connor, University Committee Chair
Prof. Trudy Turner, Secretary of the University
Provost Johannes Britz

11